UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MARCOS GERMAN MENDEZ

16 CR 163

Honorable Mary M. Rowland

## GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND POSITION PAPER AS TO SENTENCING FACTORS[1]

## TABLE OF CONTENTS

I. FACTUAL BACKGROUND.........................................................…......................1

    A. Discovery of Child Pornography on Defendant's iPhone, and
    Defendant's Remote Wipe of the Phone………………………………….........2
    B. Defendant's Production of Child Pornography……………………………3
    C. Defendant's Admissions to SB……………………………………………5
    D. Defendant's Flight and Obstruction……………………………………5

II. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT (PSR)...8

    A. Defendant Should Not Get an Offense Level Reduction for Acceptance
    of Responsibility………………………………………………………….........8
    B. The JVTA Applies to Defendant……………….......................................10

III. GUIDELINE CALCULATIONS AND MAXIMUM PENALTIES……………....12

IV. THE FACTORS SET FORTH IN 18 U.S.C §3553(A) WARRANT A SENTENCE
    OF 360 MONTHS' IMPRISONMENT……………………………………………13

    A. Nature and Circumstances of the Offense……………………….......…13
    B. History and Characteristics of the Defendant…………………………16

---

[1] The government moves for leave to file this sentencing memorandum in excess of 15 pages due to the efficiency of combining objections to the PSR and its position paper on sentencing factors in the same filing.

C. The Need to Reflect the Seriousness of the Offense, Afford Adequate Deterrence, Promote Respect for the Law, Provide Just Punishment, Protect the Public, and Provide Correctional Treatment...................22

V. RESTITUTION...........................................................................24

A. Background.......................................................................24
B. Request for Restitution....................................................27

VI.SUPERVISED RELEASE...........................................................28

VI. CONCLUSION.........................................................................28

## TABLE OF AUTHORITIES

*Gall v. United States*, 552 U.S. 38 (2007)………………………….................13

*Lagos v. United States*, 138 S. Ct. 1684 (2018)………………………………26

*New York v. Ferber*, 458 U.S. 747 (1982)………………………………….14, 26

*Osborne v. Ohio*, 495 U.S. 103 (1990)…………………………………………14

*Paroline v. United States*, 572 U.S. 434 (2014)……………………………25, 26

*United States v. Arceo,* 535 F.3d 679 (7th Cir. 2008)…..……………………….8

*United States v. Baker,* 672 F.Supp.2d 771 (E.D. Tex. 2009)…………………...27

*United States v. Black*, 636 F.3d 893 (7th Cir. 2011)………………………….…9

*United States v. Cano-Rodriguez*, 552 F.3d 637 (7th Cir. 2009)……………..….13

*United States v. Cisneros*, 846 F.3d 972 (7th Cir. 2017)……………………….…9

*United States v. Danser*, 270 F.3d 451 (7th Cir. 2001)…………………..….25, 26

*United States v. DeLeon,* 603 F.3d 397 (7th Cir. 2010)…………………………9

*United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013)…………………….…25

*United States v. Dillard*, 891 F.3d 151 (4th Cir. 2018)…………………………26

*United States v. Goff*, 501 F.3d 250 (3d Cir. 2007)……………..………………23

*United States v. Gonzalez–Mendoza,* 584 F.3d 726 (7th Cir. 2009)…………..….9

*United States v. Graves*, 908 F.3d 137 (5th Cir. 2018)…………………………10

*United States v. Hosking*, 567 F.3d 329 (7th Cir. 2009)…………………………26

*United States v. Hoskins*, 876 F.3d 942 (8th Cir. 2017)…………………….25, 26

*United States v. Janatsch*, 722 F. App'x 806 (10th Cir. 2018)…………………..10

*United States v. Kelley*, 861 F.3d 790 (8th Cir. 2017)…………………………10

*United States v. Klug*, 670 F.3d 797 (7th Cir. 2012)……………………………14

iii

*United States v. Lail*, 736 F. App'x 381 (4th Cir. 2018)………………………………10

*United States v. Porter,* 145 F.3d 897 (7th Cir. 1998)……………………………….8

*United States v. Roberts*, 698 F.3d 937 (7th Cir. 2012)…………………………….....25

*United States v. Shepherd*, 922 F.3d 753 (6th Cir. 2019)……………………………10

*United States v. Strange*, 692 F. App'x 346 (9th Cir. 2017)……………………….10

*United States v. Uresti*, 476 F. App'x 80 (7th Cir. 2012)…………………………….8

*United States v. Walker*, 353 F.3d 130 (2d Cir. 2003)………………………………..25

*United States v. Whitley*, 354 F.Supp.3d 930 (N.D. Ill. 2018)…………………………25

iv

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, Jr., United States Attorney for the Northern District of Illinois, hereby submits its position paper as to sentencing factors, and asks this Court to impose a Guidelines sentence of 360 months' imprisonment.

## I.    FACTUAL BACKGROUND[2]

Defendant Marcos German Mendez molested a 3-year-old toddler, Victim A, and used her to make child pornography. He did this more than once. He also transported and possessed at least 64 images of that little girl's abuse and exploitation, in addition to other child pornography.[3]

From 2013 to 2016, Victim A's grandmother, SB, had a secret romantic relationship with defendant. GVO Exh. 1. It was secret because defendant was more than 20 years younger than SB, and they were coworkers. SB's son, his girlfriend, and their daughter, Victim A, lived with SB at her residence. At least once every three months, SB brought her granddaughter Victim A to defendant's apartment overnight to give Victim A's parents time alone. Victim A was 3 years old and still in diapers at the time.

---

[2] Unless otherwise notated, the facts presented in this section are from defendant's plea agreement, the Government's Version of the Offense (GVO) and associated exhibits, the Presentence Investigation Report (PSR), and the images that are the bases for the count of conviction, the stipulated offense, and relevant conduct.

[3] Prior to sentencing, the government will provide to the Court a binder containing a sample of the images that are the subject of the count of conviction and the stipulated offense, as well as a designated laptop computer on which to view the images.

Unbeknownst to SB, at night, defendant would go into the guest bedroom where Victim A slept, remove her diaper, open her legs, and take pictures of her genitalia. Defendant also molested her. Victim A was speech delayed and was not able to communicate about what was happening to her. Defendant knew that.

### A. Discovery of Child Pornography on Defendant's iPhone, and Defendant's Remote Wipe of the Phone

On February 21, 2016, defendant arrived at O'Hare International Airport aboard a flight from Ecuador via Panama City. When defendant attempted to clear customs, CBP officers conducted a border examination of defendant and his belongings due, in part, to defendant having been arrested for child solicitation before. CBP officers observed child pornography in his photo stream. They also saw videos and photos containing child pornography that defendant had stored in an application called iSafe, which functions to keep data secure and hidden on phones. In one video, an adult male appeared to be recording the video as he was having sex with a young girl from behind. In a second video, a young girl, approximately 10-11 years old, was having oral sex with the adult male and then going back and forth to a young male around her age. After this, the young girl lay on her back and the adult instructed the boy on how to have intercourse with the girl.

CBP downloaded the contents of the phone. After their examination of the phone, CBP officers detained the phone but allowed defendant to leave the airport.

2

Within hours of being released from airport, defendant used another electronic device to remotely wipe the contents of the iPhone that CBP had seized.[4] When agents attempted to turn the phone on, they saw only a welcome screen. Because the CBP download was not able to copy iSafe application data, that evidence of defendant's child pornography offenses was destroyed, and the only child pornography that remained was what was in his photo stream and had been successfully copied.

When he was released from the airport, defendant used his work iPhone to research: (1) how to remotely wipe his iPhone and erase its data (for example, "How to Permanently Delete Everything from iPhone 6/5S/5/4S/4"); (2) how to keep "embarrassing" iPhone photos "safe"; (3) child pornography statutes; and (4) forensic tools used by law enforcement to examine electronic devices.[5] GVO Exh. 2. Defendant also unsubscribed from Adam & Eve, the sex toy company where defendant bought what appears to be the dildo featured in the child pornography he produced of Victim A.

### B. Defendant's Production of Child Pornography

The child pornography that remained on the phone was comprised of 66 images of Victim A. Defendant produced four of these images in May 2015, and 62 in December 2015. The below chart includes a description of some of these images. In these images, Victim A was lying on an olive green comforter in defendant's guest bedroom, with a small white hand towel under her buttocks, an olive green towel on

---

[4] iCloud records show that defendant initiated a wipe of his iPhone at 4:56:29 a.m. CDT on Sunday, February 21, 2016 using his Apple ID.

[5] Law enforcement executed a search warrant on defendant's work electronics, which included an iPad Air, an iPhone 5S, and a laptop computer.

the bed, and her pink baby blanket over her chest and part of her face. SB confirmed that the pink blanket was Victim A's baby blanket, and she took it everywhere with her.

| File | Description |
|------|-------------|
| 22426_5003.JPG | Victim A nude from the waist down, with her genitalia exposed. |
| 22400_5003.JPG | Victim A nude from the waist down with her knees up and legs spread, exposing her genitalia. |
| 22406_5003.JPG | Victim A nude from the waist down with her knees up and legs spread, exposing her genitalia. Positioned close to Victim A on the bed is a two-headed dildo. As described more fully below, SB later confirmed that she and defendant used that dildo, primarily on defendant's anus. |
| 22407_5003.JPG | Victim A nude from the waist down with her knees up and legs spread exposing her genitalia. Positioned close to Victim A on the bed is the two-headed dildo. |
| 22408_5003.JPG | Victim A nude from the waist down with her knees up and legs spread exposing her genitalia and buttocks. |
| 22389_5003.JPG | Victim A nude from her waist down, with her legs propped up and spread, with her genitalia exposed and defendant's finger[6] touching her vulva. |
| 22390_5003.JPG | Victim A nude from her waist down, with her legs propped up and spread, with her genitalia exposed and defendant's finger touching her vulva. |
| 22391_5003.JPG | Victim A nude from her waist down, with her legs propped up and spread, with her genitalia exposed and defendant's finger touching her vulva. |
| 22392_5003.JPG | Victim A nude from her waist down, with her legs propped up and spread, with her genitalia exposed and defendant's finger touching her vulva. |

---

[6] Defendant admitted in his plea agreement that some of the images depict him touching Victim A's genitalia.

4

The next photos after the child pornography images, files 22437~5003.JPG, 22438~5003.JPG, 22439~5003.JPG, and 22440~5003.JPG, are four close-up photographs of defendant masturbating his penis.

### C.    Defendant's Admissions to SB

SB met defendant at his apartment the night he was released from the airport. GVO Exh. 1. Defendant told her that CBP had taken his phone and that he was in trouble because in Ecuador he had looked at child pornography, specifically, "pictures of young girls." Defendant told her that he thought he had deleted the photos, but CBP found them. Defendant said, "I'm a pedophile."

Defendant also told SB that he had been arrested before for a felony charge involving underage girls—more specifically, that he had met an underage girl online, and she sent pictures of herself to him. Defendant told her he only got 24 months' probation and counseling in connection with that conviction. Defendant told SB that he knew he would go to prison this time.

### D.    Defendant's Flight and Obstruction

In addition to wiping his iPhone and destroying electronic evidence, defendant attempted to and did destroy and conceal physical evidence. The morning he was released from the airport, defendant started throwing out many of his belongings, including items pictured in the child pornography. One of those items was the olive green comforter that was on the bed in the bedroom where he molested Victim A. GVO Exh. 1. SB retrieved it and put it in her storage unit because she had purchased

it. Defendant asked SB to get rid of other items she had bought for him, and she instead took them to her storage unit.[7]

When SB returned to the apartment that same day, defendant had a gun. Defendant told her that he hoped the police would show up so that he could die, "suicide by cop." Defendant continually looked out the window to check whether police had arrived. SB later left, taking defendant's laptop with her at defendant's request.

Later, defendant called SB and told her that his parents had come over, he had told them everything, and they were going to take care of everything, including by taking him. Defendant told her he was saying goodbye and that he was not going to tell her where he was going so that she would not get in trouble.

The next day, on February 22, 2016, defendant asked SB to return the family's vehicle that she had been using along with his laptop. SB did so, and defendant drove her back home. During the drive, defendant told her that she would never see him again, and that he would only be using cash and would be cutting off all communications with everyone. Defendant was disappointed and crying because he would be ruining his credit and would have to turn his new black Cadillac into the dealer. Defendant told SB that he and his mother were going leave town, and his father was going to come to his apartment and clean it out.

Defendant fled the country, with the help of his mother, Maria Ramos. Defendant has family in Leon, Guanajuato, Mexico. From February 22 to 23, 2016, defendant's mother drove him to the Mexican border and into Mexico via Laredo,

---

[7] Law enforcement later seized the comforter and other items from SB's storage unit.

Texas. CBP cameras captured defendant's mother's SUV with defendant and his mother inside, crossing into Mexico on February 23, 2016, at 6:12 p.m. GVO Exh. 3. His mother returned to Chicago on March 8, 2016 via a one-way flight, leaving her SUV in Mexico for defendant to use.

Meanwhile, defendant's father, Marcos Mendez, Sr., took other actions on defendant's behalf. According to defendant's then-employer, DMG Mori USA, on February 23, 2016, Mendez Sr. contacted DMG Mori and requested FMLA leave on defendant's behalf for 5 weeks due to a "family matter." According to defendant's landlord, defendant's father contacted her and told her that defendant was out of the city and wanted to break the lease. Defendant's father also told her that defendant's belongings would be cleaned out of the apartment by the upcoming weekend.

Law enforcement executed a search warrant on defendant's apartment on March 10, 2016, but it had been cleaned out. Law enforcement spoke with defendant's mother and father, who told agents that they knew where defendant was and could get in contact with him, but they would not reveal his location. They also refused to consent to a search of their house on Newport Avenue.

Law enforcement obtained and executed a search warrant for defendant's parents' residence on March 10, 2016. Agents found many items that appeared to be the items in the background of the child pornography images with Victim A, including an olive green towel and olive green pillow cases. Agents observed defendant's furniture and belongings in his parents' basement and garage. Agents also recovered various items depicted in non-pornographic images on defendant's iPhone.

Defendant's prior counsel assured the government on two occasions in 2016 that defendant would be returning to the United States to voluntarily surrender. He never did. Instead, the United States and Mexican governments worked to extradite defendant to face charges for his crimes for nearly four years.

## II. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT (PSR)

### A. Defendant Should Not Get an Offense Level Reduction for Acceptance of Responsibility

The government agrees with the criminal history and offense level calculations set forth in the PSR, with one exception: defendant should not get a reduction for acceptance of responsibility. PSR ¶¶52-53.

The Seventh Circuit has repeatedly affirmed the withholding of acceptance points for defendants who are found to have obstructed justice absent "exceptional circumstances." *United States v. Uresti*, 476 F. App'x 80, 82 (7th Cir. 2012). In *U.S. v. Uresti*, the district court refused to award acceptance credit to a defendant who had obstructed justice by fleeing, even though both defendant and the government agreed that the reduction could apply. The Seventh Circuit affirmed and explained:

> Counsel next considers whether Uresti could dispute the district judge's refusal to award any reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1. The judge found that Uresti obstructed justice, *see id.* § 3C1.1, because he fled Illinois after his lawyer advised him that federal prosecutors had charged him and that he should surrender himself for arrest. We have held that "calculated evasion" of arrest can support the increase for obstruction of justice, *see United States v. Arceo*, 535 F.3d 679, 687 (7th Cir. 2008); *United States v. Porter*, 145 F.3d 897, 903–04 (7th Cir. 1998), and even though the government agreed with Uresti that he should receive a downward adjustment for acceptance of responsibility, the district court concluded that Uresti's case did not present extraordinary circumstances warranting application of a § 3E1.1 reduction despite his obstructive conduct. *See* U.S.S.G. § 3E1.1 cmt. n. 4. We agree with counsel that an appellate claim challenging this finding as

clearly erroneous, *see United States v. Black,* 636 F.3d 893, 900 (7th Cir. 2011), would be frivolous. When a sentencing court properly finds that the defendant obstructed justice, only a showing of exceptional circumstances will overcome the resulting presumption that the defendant had not accepted responsibility. *United States v. DeLeon,* 603 F.3d 397, 408 (7th Cir. 2010); *United States v. Gonzalez–Mendoza,* 584 F.3d 726, 730–31 (7th Cir. 2009). Counsel is unable to identify any such circumstances.

*Id.* Similarly, in *United States v. Cisneros*, 846 F.3d 972 (7th Cir. 2017), the Seventh Circuit found flight from arrest warranted the obstruction enhancement and that the district court did not err in refusing acceptance credit.

Here, defendant's obstruction was far more extensive than simple flight from prosecution, which in and of itself is sufficient to disqualify defendant from the acceptance reduction. Defendant not only removed himself from the country but also attempted to destroy every bit of evidence of his child pornography crimes. Immediately after leaving the airport, he remotely wiped his iPhone, which succeeded in destroying some of the evidence in this case. He unsubscribed from the sex toy company where he purchased a dildo that appeared to be the one in his child pornography photos. He tried to throw out nearly all of his possessions tied to the offense, including the comforter that the little girl lay on while he molested her. With his parents' help, he broke his lease and moved all of his possessions out of the apartment where he molested Victim A. And with his mom's help, he drove straight south, crossing the border into Mexico within 2 days of being released from the airport. He tried to destroy every shred of physical and electronic evidence of his crimes, and he fled the country, which required two countries to put in nearly 4 years' worth of work and resources to force him back to the United States to face justice.

9

Defendant has not shown exceptional circumstances to warrant a reduction in offense level for acceptance of responsibility in this case, nor can he. The reduction does not apply.

## B. The JVTA Applies to Defendant

Defendant should be assessed $5,000 pursuant to the Justice for Victims of Trafficking Act, 18 U.S.C. § 3014. This fine is mandatory for all non-indigent persons and is to be paid after defendant has satisfied all court-ordered restitution. 18 U.S.C. § 3014(b). In deciding whether defendant is indigent of the purpose of the JVTA, this Court may consider both defendant's current ability to pay, which was considered in the PSR, and *also* defendant's earnings potential. *See, e.g.*, *United States v. Shepherd*, 922 F.3d 753, 757 (6th Cir. 2019); *United States v. Graves*, 908 F.3d 137, 138 (5th Cir. 2018); *United States v. Janatsch*, 722 F. App'x 806, 811 (10th Cir. 2018); *United States v. Lail*, 736 F. App'x 381, 382 (4th Cir. 2018) (per curiam); *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017); *United States v. Strange*, 692 F. App'x 346, 349 (9th Cir. 2017). Part of the justification for this standard is the defendant's obligation to pay the assessment does not end until "the later of 20 years from the entry of judgment or 20 years after the release from imprisonment of the person fined, or upon the death of the individual fined." *Shepherd*, 922 F.3d at 758 (quoting 18 U.S.C. § 3613(b)) (internal quotation marks omitted).

A court's decision regarding whether to waive other applicable fines for a defendant is not dispositive of the JVTA assessment. Nor is whether defendant has

been appointed counsel. *Shepherd*, 922 F.3d at 759 and n.1.[8] Here, of course, defendant has retained counsel.

Defendant has provided no documentation or verification to the government or probation indicating that he is indigent within the meaning of the JVTA. Instead, before he fled the country, he was making nearly $8,000 per month, nearly $100,000 per year, in a position that he held for five years as an applications engineer. PSR ¶109. He is a high school graduate and one semester short of earning his college degree in industrial technology. PSR ¶101. He speaks three languages. PSR ¶103. He plans to continue his career as a manufacturing engineer or in robotics, and he wants to expand his education to include cryptocurrency banking and investing. PSR ¶103, 104. Defendant's father has stated that defendant has a guaranteed job with him after his prison sentence. PSR ¶73. In other words, all of the information in the PSR suggests that defendant will have significant earnings potential after his incarceration, in addition to the money he can earn while in prison. Other than the restitution imposed in this case, when defendant completes his prison term, he will have no outstanding and ongoing financial obligations such as child support or student loan payments.[9]

---

[8] The court noted:
> This is a matter of common sense: a criminal defendant might be unable to pay a six-figure legal bill and yet still possess the means of subsistence. Although all indigent defendants might be financially unable to obtain adequate legal counsel, the inverse is not necessarily true. That Shepherd has court-appointed counsel is not sufficient to support a finding of indigency.

*Id.*

[9] Defendant appears to have a debt related to an auto loan that has been resolved by a repossession, and he has some modest credit card debts, all of which could be satisfied with less than two months of the salary he earned at his prior job. PSR ¶113.

The $5,000 assessment applies.

## III. GUIDELINE CALCULATIONS AND MAXIMUM PENALTIES

As noted above, the government agrees with the criminal history and offense level calculations set forth in the PSR, with the exception of the application of acceptance of responsibility credit. PSR ¶¶34-54; 60-62. The government agrees that the chapter four enhancement for a pattern of activity involving prohibited sexual conduct applies here. USSG §4B1.5(b)(1).

Despite the disagreement on the acceptance reduction, the government agrees with the ultimate offense level set forth in the PSR, 43. USSG Chapter 5, Part A (comment n.2).

With an offense level of 43 and a criminal history category of I, defendant's advisory Guidelines imprisonment range is life imprisonment. PSR ¶117. However, the statutorily authorized maximum sentence is 30 years' imprisonment. *Id.* Thus, pursuant to Guideline § 5G1.1(a), the applicable Guidelines range is 360 months' imprisonment. *Id.* Defendant is subject to a minimum term of imprisonment of 15 years. PSR ¶116.

## IV. THE FACTORS SET FORTH IN 18 U.S.C. § 3553(A) WARRANT A SENTENCE OF 360 MONTHS' IMPRISONMENT

The Sentencing Guidelines provide a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). Although a sentence within the Guidelines range is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in Title 18, United States Code, Section 3553(a) in determining an appropriate

12

sentence. The Guidelines range in this case is 360 months' imprisonment. Considering the factors set forth in Section 3553(a), a Guidelines sentence of 360 months' imprisonment is sufficient, but not greater than necessary, to reflect the seriousness of defendant's offense, promote respect for the law, provide just punishment for defendant's crime, and afford adequate deterrence to similar criminal conduct.

## A. Nature and Circumstances of the Offense

The depravity and cruelty of defendant's conduct, which is fully laid out above and in the Government's Version of the Offense, cannot be overstated. Defendant used a three-year-old baby girl who was still in diapers for his own sexual gratification. He knew she couldn't tell anyone what he was doing to her. He molested her, took photos of her toddler-aged vulva, and then masturbated. The offense conduct here is nothing short of revolting.

Victim A, her parents, and defendant's former girlfriend, Victim A's grandmother, will have to deal with the aftermath of defendant's crimes for the rest of their lives. It is unknown whether defendant shared any of the images he created with others, and the family has to live with that terror and uncertainty as well.[10]

---

[10] The Supreme Court has observed that "child pornography is pernicious precisely because the harm it produces is not limited to the sexual abuse it depicts." *United States v. Klug*, 670 F.3d 797, 800–01 (7th Cir. 2012); *see New York v. Ferber*, 458 U.S. 747, 760 n. 10 (1982). "Because the child's actions are reduced to a recording," the Court reasoned, "the pornography may haunt him in future years, long after the original misdeed took place." *Ferber*, 458 U.S. 760 n. 10 (1982); *see also Osborne v. Ohio*, 495 U.S. 103, 111 (1990) (observing that "pornography's continued existence causes the child victims continuing harm by haunting the children in years to come"). "Indeed, in the years since *Ferber* was decided, federal courts have focused on the enduring harm to the child victims in concluding that child

Victim A's parents submitted a victim impact statement. Second Supp GVO Exh. A. In it, Victim A's parents wrote, "We have been living for 6 years with the fear of leaving our daughter with anyone other than us." They explained that they work opposite shifts so that one of them is always available to be with Victim A. Victim A's mother elaborated on the toll that defendant's abuse of her daughter has taken on the entire family:

> The mental toll this has taken on me has been unrelenting. I have severe anxiety and panic attacks/disorders since learning of what happened to my daughter. My daughter has severe anxiety. I want to stay home with my daughter all of the time. I don't ever want to leave her. My daughter has panic and anxiety disorders. [. . .] I put on a smile for her even though I am sad and scared most of the time.

> My daughter has an eating disorder and is very particular about anything she eats. She has struggled to keep her weight in the normal and we have to purchase foods she likes from the corresponding store that she will eat the food from, which has been very costly for us.

> I had to file for bankruptcy because I lost my job to stay home with our daughter and ended up putting bills on credit cards, just to make ends meet. I incurred such a high amount of interest on the credit cards that it forced me to file for bankruptcy.

> We lost all of our friends after we learned of what happened to our daughter at the hands of MENDEZ. Our friends judged and stopped speaking with us because we continued to live with my mom after we learned of the abuse that happened because of the man that she brought into my daughter's life. W[e] could not afford to live on our own and did not want our daughter to be homeless, so we stayed with my mom, and I continued to work to save for my own place as fast as I could. I want my daughter to be close to my mom but struggle everyday over what happened to her while she should have ben [*sic*] safe.

> Our daughter was too young to be forensically interviewed at the time we learned about her abuse. She had to get a STD test but freaked out so badly that they could not conduct the physical exam at the time. We had to come

---

pornography offenses warrant harsh sentences." *Klug*, 670 F.3d at 800–01 (7th Cir. 2012) (collecting cases).

back and try again. We struggle with wanting to get our daughter evaluated because of what she went through but then not wanting to bring back any of those terrible memories of what MENDEZ did to her. The school has evaluated our daughter as having autism which we believe is a direct result of what she endured with MENDEZ. Some of her school officials believe she has trauma-mirroring autism, due to what she endured at the hands of MENDEZ. We had always wondered why we were having such a difficult time with potty training our daughter. She would not let us wipe her or clean her and would go into a big fit if we tried. It was not until years after MENDEZ had fled the country that she was able to be potty trained, at age 6. We knew something was not right but didn't put two and two together until we learned of what happened to our daughter.

Our daughter is behaviorally delayed, speech delayed and sees an occupational therapist, a speech therapist, and a social worker. For now, the school has taken care of the costs of these special services for our daughter, but we fear that one day she may not have access to everything she needs. She continues to suffer with speech delays and according to the school, is mentally behind between 1 or 2 years of where she should be. Because of this, we have watched our daughter struggle to make and keep friends in school and even in the neighborhood.

My daughter is fascinated with YouTube and wants to create live stream videos and vlogs. She wants to stream her games on Twitch, TicTok and YouTube but we restrict everything living in fear that MENDEZ may have sent her images out to people and they may recognize her in the images. They may locate her address and come find her.

Defendant's obstruction after he committed these horrific offenses likewise affected

the family. Victim A's mother explained:

WE have spent years wondering after MENDEZ fled the United States if they would ever find him. Years were spent in fear, and we continue to fear for the future of our daughter. Will she one day be intimate with someone and will all of those awful memories flood back to her? [. . .] Will we ever get the closure that our family so desperately wants and deserves?

We know that things will never go back to how they were before March of 2016, but we hope that we can give our daughter a somewhat normal life and will fight every day to keep her safe and provide for her because she didn't ask for or deserve any of this. No one does. This is a nightmare that we all wish we could wake up from.

15

Victim A's grandmother also submitted a victim impact statement. Second Supp. GVO Exh. C. In that statement, she described the effects that defendant's crimes had on her personally and on her family:

> The impact that was left on my family will be forever. We are very protection [*sic*] and constantly watching everyone that comes near and the constant watching of signs that maybe triggered. My family doesn't trust many outsiders anymore. [. . .] You [defendant] have brought so much pain and sorrow to my family that mere words can't describe….

The nature and circumstances of defendant's offenses support a sentence of 360 months' imprisonment, to provide justice for the entire family that he victimized and to reflect the abhorrence our society and our justice system holds for this conduct.

## B. History and Characteristics of the Defendant

Defendant is a recidivist. As described more fully in the GVO, defendant was convicted of child endangerment in Kane County, which was pled down from indecent solicitation of a child for sexual penetration and child pornography charges. GVO Exh. 5 at 1-8, 15. In that case, defendant, who was 22 at the time, used teenspot.com, and later text messaging and phone calls, to solicit sex and receive nude photos from a 13-year-old girl, who he knew lived nearby. GVO Exh. 6. In one of her messages to him, she told him she was in 8th grade. Some of defendant's teenspot.com messages to the victim are on pages 3-52 of GVO's Exhibit 6. Some of these messages include:

> damnn babe ur two last pics where hot as fuck!!!! so sexy, nice legs, would like to see the same thing in person but without pants and that hoody tee hee hee….i'm not gonna lie, i kinda jerked off to ur pics tonite lol….. [. . .] i wanna meet u this week ]if possible. muah hope all is well. bye my love.

> Im just scared u might do something else with him, or even worse…….have sex with him. I wanna be ur first. I really like u a lot. U make me so horny too, i

16

just think ur soooo sexy and hot. I really cant wait to make love to you. Lets figure a day for us babe…please dont push this off

u wanna smoke pot and have sex this week or weekend my love?

damnnn babe ur new pics are so hot…………what u doin this week……….im determined to meet u this coming week ok babe

i was thinking if u want to fuck this weekend? can u sneak out?

On at least five occasions, defendant had the victim send him photographs of her exposed breasts, and on at least one addition occasion, defendant had the victim send him a photo of her exposed breasts and groin area. *Id.*

Additional teenspot.com messages from that case file show that defendant was sexually interested in at least five additional children that he believed to be between 12 and 14 years old and that he believed to be local and, therefore, meetable. GVO Exh. 7. For example, defendant messaged one child:

so are you single now? how is 8th grade going for you

u look cute from ur two pics. so what do u do when u get horny? ever plan on losing that virginity anytime soon?

your going to wait till 16? why not now when so you can be getting expierence and all. what kind of men u into?

well you can always use a condom and the guy can pull out right when he is about to *** and so 0% chance of getting pregnant. thats what we all do in college and it works so dont worry. you should try that. it will relieve u of being horny and plus you will enjoy sex. im not gonna lie, ill have sex with you. i think ur cute.

As another example, defendant messaged another child:

[after the child said, "Aren't you scared? i mean, you're 22. I'm 14. Kinda weird, no offence."] im not gonna lie, it is scary. it really is i mean i can go to jail for a long time. [. . .] it would be illegal if i had sex with you. [. . . ] i dont think its that wierd. i mean it is cuz ur a lil young and u dont know much and body size

17

but i always wanted a young gf. I just think girls ur age are more attractive. [. . .] i mean u sound cute, i think ur attractive, and the lil we talk u seem kool, live close by, why not give u a shot right?

Defendant's child pornography and molestation crimes did not stop after his 2011 conviction. In fact, according to defendant, Victim A is not the only child defendant molested in 2015. Defendant maintained a Craigslist account that he used to exchange messages with others, whom he described as "pedophiles," about abusing children.[11] In these June 2015 messages, defendant boasted about his rape of prepubescent little girls, instructed others how to molest children, and expressed a wish to visit a pedophile resort. GVO Exh. 4. Some of these messages as follows:

In reference to raping two girls, one of whom was 5 years old, and one of whom was 9, defendant said (GVO Exh. 4 at 5):

It's a huge adrenaline rush! I sky dived and done some crazy stunts but nothing compares to having sex with girls. Omg it's the best sex ever! Super tight, bald pink soft pussy, perfect smooth curve bodies but the innocence is what excites me. I mold them to how I want them to fuck. The 9yr can take my entire 6in her pussy, the 5yr can just do mutual oral and fingering.

To another Craigslist user, defendant said, "I'm into young girls 8-13. [. . .] I've been with some young girls before. Never been inclined to young boys tho but wouldn't mind trying it out." *Id.* at 4. To a different user, defendant said, "I enjoy meeting and talking with other pedophiles. Kool. I'm 28 but got into younger girls when I was 18." *Id.* at 10. He continued, "Yea once their after 15 I'm. It not into it. I prefer 12-15 but can do 7. Anything below, can't really do much." *Id.*

---

[11] This account was associated with his email address and confirmed both by SB and by the content of the messages, in which he referred to himself as "Marcos."

Defendant explained how he got into the "lifestyle" of child pornography and child rape (*Id.* at 1):

> I like girls between 5-13. I got into this lifestyle by accident. I found a jump drive hidden in an apartment I moved into. Found a lot of pics and vids of kids posing or playing with daddy or uncle joe(if u know what I mean). Met a white trash hill billy on Cl with two step daughters she didn't care for ages 8-10. Was sleeping with the step mom for two months then convinced her to let me sleep with the two. Been having fun with those girls for about a year now.

Defendant went into greater detail with another Craigslist user (*Id.* at 7-8):

> I'm into young girls ages 5-13. I found a jump drive hidden in an apartment I moved in. Found over 20k of pics and like 200 vids of girls posing or playing with daddy or uncle joe(if u know what I mean). I met a white trash hill billy step mom on Cl a year ago with two step daughters age 7 and 9. She married a divorced dad whom later passed away a year after leaving her with her two step daughters. She dosent care much about them. After fucking the mom for 3 months, I kinda convinced her to let me sleep with them two. I been having sex with the girls for about 6 months. I see them every other week.

> I got lucky to be honest. I posted an ad looking for single moms and with the intent to find one that was willing for the right price. Aim for low income or country people. Yea I still have everything. I like to put the pics on my laptop while I'm with them so I can explain to them what we are doing is totally normal and ok but shouldn't tell anyone. They were very puzzled first the first time I showed them the pics and vids but later were just curios to c more pics and vids. I always play with both girls so there won't be a jealousy between them. We were watching the vids and pics, I then pulled out my cock to see there reaction and they were ok. Offered them to touch it and imitate what I was showing them. Showed them adult porn movies so they can learn better. First time we just all got naked and touched. The next time we all showered, touching and some oral. We did only oral and touching for a good 2 months. Once they were ok and actually enjoyed oral sex, I introduced them to toys but first I had to pop them. The 7yr pussy is small for my cock but the 9yr can take it. I popped the 7yr with my pinky and a small vibratory. After the pain of popping them and blood scare was over, they really really seemed to liked the vibrator. I played with the girls with the toys, fingering and oral sex. They would cum and moan like an adult. That's when they liked sex. Once I felt the 9yr was ready, I had sex with her. Omg best sex ever!!!! So tight and sexy smooth bodies. I fuck the 9yr like she was 18. We make out, oral and vaginal sex, with some dildoing too. The 7yr just does oral, touching and small toy play. I'm giving her another year to c maybe her pussy gets bigger for my

19

cock. So yea man, I been having sex with these girls for 6 months now and going. The girls really love me. They enjoy the sex. Once u introduce them to an orgasm, they are all yours. These girls can get wet and horny in a sec. I've bought the, sexy lingerie and toys. The step mom dressed them up and all every time I come over.  I wanna meet other people like my situation so we can swap girls or have some young orgy, hence why I made this ad.

Defendant expressed an interest in carrying out a "human pig" fetish with the two girls he was regularly raping. *Id.* at 6. Specifically, another Craigslist user explained that the fetish involved "prep you ,shave body, flush out guts, oil me up, and tie to a spit, over very low fire." Defendant asked the user, "U ever use young girls as pigs?" and said he "was thinking about doing that with [the two stepdaughters described above]."

Defendant gave advice to others who expressed an interest in molesting and raping young girls. He told one Craigslist user (*Id.* at 5):

Go to third world countries. U can pay families for there kids or just pay a homeless girl 30 bucks for her body. I plan on going to the Dominican Republic to be with more. I keep hearing there cheap over there and lots of them willing to do anything for the right money(which isn't a lot)

Regarding his collection of child pornography, defendant said, "Yea I have about 20k of pics and like 200 vids age range 5-15 from posing to playing." *Id.* at 1. He also offered to share his child pornography collection: "We can meet in public and I can dump all the pics and vids on ur laptop if u want some day." *Id.* at 2.  In addition, as noted above, at the time law enforcement discovered child pornography depicting Victim A in defendant's phone, he also possessed child pornography depicting other victims in an iSafe application that he successfully remotely wiped from his phone.

20

The Government's Version of the Offense contains many more examples of these conversations. Defendant was and continues to be determined to molest, abuse, and victimize little girls for his own sexual gratification. Defendant had no problem taking advantage of Victim A's helplessness, innocence, and trust, and abusing her.

In addition to the conduct described above, defendant had Victim A put an adult-sized dildo in her mouth. As more fully described in the GVO, Victim A's grandmother recalled an instance in 2015 when she had brought Victim A over to defendant's apartment for the night and was giving her a bath. She exited the bathroom to retrieve Victim A's clothes and returned to find defendant alone in the bathroom with the toddler, who had a large, flesh-colored dildo in her mouth. This was a dildo that SB and defendant used together, and that they specifically used in defendant's anus. Defendant was laughing when SB returned to the bathroom and told her that he thought that this was funny.

In addition to all of this, defendant has a troubling history with firearms. As described above, after he was released from the airport in February 2016, he threatened to commit suicide by cop while holding a gun. In addition, defendant violated the conditions of his probation for his child endangerment conviction by possessing firearms. PSR ¶61.

This is the only case the undersigned AUSA has ever seen where there truly is no mitigation. This makes this defendant stand out amongst others who commit this kind of crime after having suffered sexual abuse themselves, after having endured incredibly difficult childhoods plagued by homelessness and addiction, and after

21

experiencing violence, among other circumstances. Defendant has none of these factors in mitigation. He was never abused or neglected. PSR ¶69. He was raised by a loving family that he is close to and had a "normal, average, loving life" with "spectacular" relationships with his parents. PSR ¶¶68, 71. He is highly educated and easily obtained and held employment. The complete and utter lack of mitigation in this case is itself aggravating.

The defendant's history and characteristics support a sentence of 360 months' imprisonment.

### C. The Need to Reflect the Seriousness of the Offense, Afford Adequate Deterrence, Promote Respect for the Law, Provide Just Punishment, Protect the Public, and Provide Correctional Treatment

Protecting innocent children from sexual predators like defendant is of the utmost importance in our society and is reflected in our laws and sentencing guidelines. Short of child murder, the government cannot imagine a more serious crime than sexual abuse of children, especially those who are so young and helpless that they would never have a chance of defending themselves. This conduct warrants our greatest punishments available under the law due to its seriousness and because of our obligation to protect innocent children from defendant.

In addition, the goals of sentencing include both specific and general deterrence. As Probation, noted, defendant's "prior conviction related to minors failed to deter him from engaging in more significant behavior." Sent. Rec. at 2. This is not a case in which the defendant had a one-time lapse in judgment. Defendant has a proven sexual interest in children, is a self-labeled pedophile, and is willing to

victimize children in various ways for his own sexual gratification. After defendant's conviction for child endangerment in Kane County, he had a sex offender evaluation that concluded that he was in the high category for sexual recidivism. PSR ¶92. Clearly, that evaluation was correct. In addition, defendant underwent sex offender treatment in connection with that conviction. PSR ¶93. This treatment was weekly and lasted a year, and yet it did nothing at all to deter him from continuing to victimize children. This further underscores the need to protect the public from defendant.

General deterrence is also a significant concern. Others must be deterred from producing, transporting, and possessing child pornography, and from molesting minor victims for their own sexual gratification. *See United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) ("deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing"). A 360-month sentence is necessary here to send the message to others who are tempted to enter this sick world and contribute to the cycle of demand for these videos and images that if they produce, obtain, share, or possess child pornography, the consequences will be severe. And a 360-month sentence is further necessary to send the message to the victims of these horrific crimes that they are not objects to be used for people's deranged gratification, but precious human beings who matter. That although they were not protected at the time of their victimization, society now will protect them with all of its resources and punish severely those involved in their molestation and exploitation.

## V.     RESTITUTION

### A. Background

In light of the defendant's convictions, pursuant to 18 U.S.C. §§ 2259 (which was initially enacted as a component of the Violence Against Women Act of 1994) and 3663A (the Mandatory Victims Restitution Act, or MVRA), the Court must order restitution to the victims of defendant's production and possession of child pornography offenses, in an amount determined by the Court.

Under these laws, the defendant must pay for "the full amount of the victim's losses," which may include the following:

(A)     medical services relating to physical, psychiatric, or psychological care;

(B)     physical and occupational therapy or rehabilitation;

(C)     necessary transportation, temporary housing, and child care expenses;

(D)     lost income;

(E)     attorneys' fees, as well as other costs incurred; and

(F)     any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(1), (3).  Section 2259(a) makes restitution mandatory.

Courts have no discretion to "award restitution for anything less than the full amount of the victim's losses." *United States v. Desnoyers*, 708 F.3d 378, 389 (2d Cir. 2013) (quoting *United States v. Walker*, 353 F.3d 130, 131 (2d Cir. 2003)). Congress intended as much because "[t]he MVRA's overriding purpose is to compensate victims for their losses." *United States v. Roberts*, 698 F.3d 937, 943 (7th Cir. 2012), *aff'd*, 572 U.S. 639 (2014) (internal citations and quotations omitted). A court may not decline

24

to issue a restitution order because of "the economic circumstances of the defendant" or "the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source." 18 U.S.C. § 2259(b)(4). A victim's losses for purposes of restitution may be retrospective or prospective, including damages for the cost of future therapy. *United States v. Danser*, 270 F.3d 451, 455 (7th Cir. 2001); *United States v. Whitley*, 354 F.Supp.3d 930, 934 (N.D. Ill. 2018) (collecting cases). Victims do not need to be in therapy or even interested in seeking therapy at the time of restitution. *Whitley*, 354 F.Supp.3d at 935.

The statute seeks "to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *Id.* (internal citations and quotations omitted). In making a victim whole again, restitution does not require a "precise mathematical inquiry." *United States v. Hoskins*, 876 F.3d 942, 947 (8th Cir. 2017), cert. denied, 138 S. Ct. 2589 (2018) (quoting *Paroline v. United States*, 572 U.S. 434, 459 (2014)). Instead, courts use discretion and judgment to analyze the "'significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses.'" *Id.* (quoting *Paroline*, 572 U.S. at 459).

Moreover, because of "the devastating and long-term effects that the sexual exploitation of children can have both upon the victims of that abuse and greater society," a victim's losses for purposes of restitution may be retrospective <u>or prospective</u>. *Danser*, 270 F.3d at 455 (citing *New York v. Ferber*, 458 U.S. 747 (1982)). In *Danser*, the Seventh Circuit specifically found that "Section 2259 allows for

25

restitutionary damages for the future costs of therapy." *Id.* This is so because the child's loss as a result of her victimization "lasts a lifetime." *Whitley*, 354 F.Supp.3d at 934.

The government bears the burden of proving the restitution amount by a preponderance of the evidence. *See United States v. Hosking*, 567 F.3d 329, 334 (7th Cir. 2009), *abrogated on other grounds by Lagos v. United States*, 138 S. Ct. 1684 (2018); *see also* 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount of restitution shall by resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government."). Regardless, it remains the "Court's duty to engage in an expedient and reasonable determination of appropriate and restitution by resolving uncertainties with a view toward achieving fairness to the victim." *Whitley*, 354 F.Supp.3d at 933 (internal quotations omitted). If the government's restitution calculation does not account for matters that concern the court, it can adjust the amount and explain its reasons for doing so. *United States v. Dillard*, 891 F.3d 151, 158, 161 (4th Cir. 2018). It is inherently difficult to quantify the losses sustained by minor victims in these cases, and "the resources often available to the parties and the Court in a full blown trial are simply not available in this type of criminal proceeding." *United States v. Baker,* 672 F.Supp.2d 771, 777 (E.D. Tex. 2009).

26

**B. Request for Restitution for Victim A**

Defendant molested Victim A and used her to produce child pornography on multiple occasions. As described above, Victim A's family have provided victim impact statements explaining the unspeakable pain and fear they endured due to defendant's abuse of the light of their life, their three-year-old daughter or granddaughter. Second Supp. GVO Exh. A and C. Defendant's conduct ripped this family apart. Victim A herself is still too young to articulate and process what happened to her.

Smith Economics conducted an in-depth forensic evaluation and economic analysis, using case materials, interviews of family members, Victim A's school medical, psychological, and other records, and other materials. Dr. Smith's report is attached to the Second Supplemental GVO as Exhibit B.

Dr. Smith divided his analysis into the following categories, all of which track covered categories under 18 U.S.C. § 2259(b)(1), (3): (1) loss of wages and employee benefits; (2) cost of future therapy; and (3) the reduction in value of life. Dr. Smith presented a range of losses for each category. For Victim A, the government recommends that this Court impose restitution in the amount of $4,732,449, which represents the low end of the range and therefore the most conservative estimate of each of the loss categories cited above, namely: $2,142,272 for future lost wages and benefits; $375,271 for cost of future therapy; and $2,214,906 for loss of enjoyment of life. This number is supported by extensive, industry-accepted scientific methods and research, as detailed in Dr. Smith's report.

27

## VI.   SUPERVISED RELEASE

Consistent with Probation's recommendation, the government recommends the imposition of a term of supervised release of ten years. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in defendant's rehabilitation and reintegration into society, the government supports Probation's recommendation that the term of supervised release include the conditions set forth in the PSR.

## VII.   CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court sentence defendant to term of imprisonment of 360 months, which is the advisory Guidelines range. Defendant has earned every bit of that Guideline sentence. This sentence reflects the serious nature of the offense and the history and circumstances of the defendant, but is not greater than necessary to reflect the goals of sentencing espoused in 18 U.S.C. § 3553.

Dated: November 14, 2022

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By:   */s/ Misty N. Wright*
MISTY N. WRIGHT
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-2061

28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MARCOS GERMAN MENDEZ

16 CR 163

Honorable Mary M. Rowland

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND POSITION PAPER AS TO SENTENCING FACTORS

was served pursuant to the district court's ECF system.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By:     */s/ Misty N. Wright*
MISTY N. WRIGHT
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-2061

Dated:    November 14, 2022

29